Filed 11/19/25  P. v. Carroll CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063968 |
| v. | (Super. Ct. No. 10CF2478) |
| TAD ALLEN CARROLL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Kimberly Menninger, Judge. Affirmed.

Martin Kassman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Alan L. Amann, and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

In 2013, appellant Tad Allen Carroll was sentenced to prison for 25 years to life after pleading guilty to first degree felony murder. In this appeal, he challenges the denial of his petition for resentencing following an evidentiary hearing under Penal Code section 1172.6.[1] Appellant contends reversal is required because there is insufficient evidence to support the trial court's finding he acted with reckless indifference to human life for purposes of the current felony-murder rule. We disagree and affirm the court's order.

FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are relatively straightforward, but its procedural history is not. The case is procedurally complicated because section 1172.6 was amended during the course of the proceedings, resulting in two separate evidentiary hearings and one previous appeal. (See *People v. Carroll* (Nov. 8, 2022, G060235) [nonpub. opn.] (*Carroll*).) We begin by setting forth the factual and procedural circumstances that led to our decision in *Carroll*.

I.

CARROLL

A. *The Original Trial Court Proceedings*

In 2010, appellant, Barbara Hamel, and Michael Ross were charged with attempting to rob Kim Nguyen, and robbing and murdering Chi Bui. The complaint also alleged as a special circumstance that the murder occurred during the commission of a felony.

---

[1] That section originally was contained in Penal Code section 1170.95, but it was subsequently renumbered without substantive change as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) For ease of reference, we will refer to the current provision. All further statutory references are to the Penal Code.

2

At the preliminary hearing, the prosecution presented both nonhearsay evidence and hearsay evidence in support of the charges. The hearsay evidence was admitted pursuant to section 872, which permits qualified law enforcement officers to relate out of court statements when testifying at a preliminary hearing. (§ 872, subd. (b); see generally *Curry v. Superior Court* (2013) 217 Cal.App.4th 580, 588 [the hearsay exception set forth in section 872 is designed to streamline preliminary hearings by allowing extrajudicial statements related by qualified officers to be admitted for their truth].)

In *Carroll, supra*, G060235, it was helpful for us to distinguish the nonhearsay evidence from the hearsay evidence for purposes of addressing the issues that were presented in that appeal. Because that distinction is also pertinent to the present appeal, we will preserve it by reciting the facts as set forth in *Carroll*:

"1. Nonhearsay Evidence

"Kim Nguyen was with the victim Chi Bui when he was killed in the early morning hours of September 3, 2010. At the preliminary hearing, she testified that at around 4:30 a.m. that day, she and Bui were driving near her Santa Ana home when a car cut in front of them and blocked their way. A man, later identified as appellant, exited the car and approached Nguyen's driver's side window with a knife. He was screaming and yelling, but Nguyen could not understand what he was saying. Then he went around to the passenger side of the car, where Bui was seated. Bui exited the car and tried to run away, but appellant caught him, and they began to fight.

"Nguyen ran to a nearby strip mall and called the police. From that vantage point, she could see appellant and Bui 'fighting back and forth.' Part of the time appellant was on top of Bui, and part of the time it was the

3

other way around. However, at no point did Nguyen see anyone use the knife or get stabbed. Eventually, the fight stopped, appellant returned to his car, and it left the scene.

"Besides Nguyen, the only other percipient witness who testified at the preliminary hearing was lead investigator Louie Martinez. He stated that when he arrived at the scene at around 5:00 a.m., Bui was lying dead in the street with blood coming out of his ears. He had tire marks across his body, and there was a small knife by his head. There were also thousands of dollars scattered in the street, including a [roll] of twenties and a [roll] of hundreds. Nguyen's car was in the area too, in the very spot where she had stopped when appellant's car initially cut in front of her.

"2. Hearsay Evidence

"Bui died as a result of being run over by appellant's car. The prosecution proved how that happened, as well as other circumstances surrounding the incident, by presenting hearsay evidence through Investigator Martinez and another member of the Santa Ana police force. Those two officers provided the bulk of the prosecution's case by testifying to statements they obtained from Nguyen and others during the course of the investigation.

"Nguyen was interviewed the day Bui was killed. She said that prior to the incident, she and Bui were at the Hawaiian Gardens Casino in Los Angeles County from about 11 p.m. to 4 a.m., during which time Bui won several thousand dollars gambling. They had no problems making it back to Nguyen's neighborhood, but as they were driving around looking for a place to park, appellant's car cut them off, and he approached their vehicle with a knife.

4

"Contrary to what she testified at the preliminary hearing, Nguyen told the police that when appellant came up to her driver's side window, he demanded her purse and 'the money.' Then he walked around to Bui's side of the car, opened his door and pulled him out of the vehicle. While Nguyen was at the strip mall talking to the police on her phone, she heard two loud 'thumps' that caught her attention. After the first thump, she saw appellant hovering over Bui on the ground. Appellant was swinging his arms, and Bui was earnestly trying to push him away. After the second thump, Nguyen saw appellant's car leaving the scene.

"Codefendant Barbara Hamel provided additional information about the incident. In an interview with Investigator Martinez, she admitted that she, appellant and codefendant Michael Ross went to the Hawaiian Gardens Casino to execute a robbery. Ross was the spotter inside the casino. Seeing Bui's winnings piling up, he gave Bui's description to Hamel and appellant, who were outside in the parking lot. And when Bui and Nguyen left the casino, Hamel and appellant followed them home in their car.

"According to Hamel, appellant was the driver. After he cut off Bui and Nguyen's car in the street, he confronted them with a pocketknife that Hamel had given him. While appellant and Bui were fighting, Hamel moved into the driver's seat and turned their car around. Then appellant returned to the car. Although he had some money with him, he said Bui had put up a good fight and that he (appellant) had been stabbed. Hamel saw blood coming from appellant's shoulder and on his hands. She also noticed he didn't have the knife anymore.

"Not knowing where Bui was, Hamel began to drive away. As she was doing so, she heard a loud thump and exclaimed, 'Oh, my God, what was that?' Appellant said, 'That was him,' meaning Bui, but Hamel just kept

5

going. She drove to Ross' apartment, where appellant gave Ross the money he had taken from Bui, which amounted to about a thousand dollars.

"Asked about their motive, Hamel said that she, appellant and Ross were only out for the money and never intended to hurt anyone. She also said Bui's death was an accident.

"At the time of the incident, appellant was living with [D.W.]. She told Investigator Martinez that when appellant came home on the day Bui was killed, he had cuts and scrapes on his knees, hands and elbows. He also had a stab wound on his left shoulder.

"As part of his investigation, Martinez also interviewed [S.L.], who is Ross' ex-girlfriend. She said that on the night Bui was killed, appellant told her that he and Ross were going to do a 'lick,' which [S.L.] understood to mean a robbery. The following day, after reading about Bui's death in the newspaper, [S.L.] called Ross and asked him if he had anything to [do] with it. He said he didn't want to talk about it." (*Carroll, supra*, G060235, underscoring omitted.)

Following the preliminary hearing, appellant pleaded guilty to first degree murder in exchange for a dismissal of the remaining charges. The trial court sentenced him to 25 years to life in prison.

*B. Appellant's Petition for Resentencing*

Five years later, in 2019, appellant filed a petition for resentencing pursuant to section 1172.6. The petition was based on changes to the felony-murder rule that had been ushered in by Senate Bill No. 1437 the previous year. (Stats. 2018, ch. 1015, § 4.) That bill narrowed the scope of the felony-murder rule such that an accomplice to a felony during which death occurs can only be found liable for murder if: (1) he was the actual killer, (2) he aided and abetted the actual killer with the intent to kill, or (3)

6

he was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subd. (e)(1)–(3); Stats. 2018, ch. 1015, § 3.)

After finding appellant made a prima facie showing for resentencing, the trial court issued an order to show cause and set the matter for an evidentiary hearing. At that time, section 1172.6 permitted the parties to rely on the record of conviction or offer new or additional evidence at the hearing. But it did not address whether hearsay evidence was admissible. (*Carroll, supra*, G060235.)

At the evidentiary hearing, neither party offered any new or additional evidence, and the matter was submitted on the record of conviction, which included the preliminary hearing. Over appellant's objection, the trial court considered all of the evidence from the preliminary hearing—meaning both the nonhearsay evidence and the hearsay evidence—in ruling on his petition. Based on that evidence, the court found appellant was a major participant in Bui's robbery and acted with reckless indifference to human life for purposes of the current felony-murder rule. It therefore denied his petition for resentencing. (*Carroll, supra*, G060235.)

C. *The Appellate Proceedings*

Appellant appealed the trial court's order denying resentencing, and while his appeal was pending, the Governor signed into law Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), which amended section 1172.6 to specify what type of evidence may be admitted at an evidentiary hearing conducted under that statute. (See Stats. 2021, ch. 551.) As amended, section 1172.6 generally permits the admission of any evidence that was admitted at a prior hearing, but it excludes hearsay evidence that was admitted at a preliminary hearing pursuant to section 872, unless the

7

evidence was admissible under another exception to the hearsay rule. (§ 1172.6, subd. (d)(3).)

As amended by Senate Bill 775, section 1172.6 would have precluded the trial court from considering the hearsay evidence that was offered at appellant's preliminary hearing in ruling on his petition for resentencing. But because Senate Bill 775 was not enacted until after the evidentiary hearing, we found no error in the trial court's consideration of that evidence. (*Carroll, supra*, G060235.) We also held that, when considering both the hearsay evidence and the nonhearsay evidence that was offered at the preliminary hearing, there was substantial evidence to support the trial court's decision to deny appellant's resentencing petition on the basis he was a major participant in Bui's robbery and acted with reckless indifference to human life. (*Ibid*.)

Nevertheless, because Senate Bill 775's amendments to section 1172.6 provided appellant grounds to file a new resentencing petition, we vacated the trial court's denial order and remanded the matter for a new evidentiary hearing so the trial court could apply the new evidentiary rules set forth in section 1172.6 without further delay. (*Carroll, supra*, G060235.)

II.

THE REMAND PROCEEDINGS

On remand, the trial court conducted a new evidentiary hearing at which the prosecution presented testimony from Nguyen and two of the police officers who were involved in the investigation of Bui's murder. Appellant testified as the sole witness for the defense.

A. *The Evidentiary Hearing Testimony*

Nguyen testified Bui had a lot of money on him when they left the casino on the night he was killed. When they got back to their

8

neighborhood and were looking for a place to park, appellant's car cut in front of them, forcing them to stop. Appellant then exited his car and approached Nguyen's driver's side window with a knife. Appellant was pointing the knife toward Nguyen and talking loudly, but she could not understand what he was saying because her window was rolled up.

Seeing appellant, Bui exited his front passenger door and tried to run away. Appellant chased him down, however, and they began fighting on the sidewalk, about 12 feet from Nguyen's car. Nguyen exited her car, ran to a nearby strip mall, and called the police. While she was talking to the dispatcher, she could still see appellant and Bui fighting by the sidewalk. But after about a minute, Nguyen lost sight of appellant, not knowing he had returned to his car. As the vehicle was driving away, Nguyen heard it run over something. She then walked back toward her car and saw Bui's bloody body lying in the street.

Domingo Cabrera testified he was working as a Santa Ana police detective at the time of the incident. When he responded to the scene, there was money scattered on the sidewalk, and Bui was lying dead in the street with a knife close to his head. Bui had tire marks across his body, and the parties stipulated he died "'as a result of being run over by a vehicle.'"

Six days later, on September 9, 2010, Cabrera interviewed appellant at the Santa Ana Police Department. Appellant said he knew nothing about Bui's death and was not even in Santa Ana at the time he was killed. However, appellant changed his story in response to further questioning from Santa Ana Police Detective Dean Fulcher.

According to Fulcher, appellant eventually admitted he and Hamel followed Bui home from the casino to get his money. Appellant said he was carrying a knife at the time, but he did not have it out when he

confronted Bui on the sidewalk. While they were fighting, Bui's money fell into the street. Appellant grabbed some of the money and returned to his car, which Hamel had repositioned and was now driving. Hamel then proceeded to run over Bui in the street as they were leaving the scene. Appellant told Fulcher that upset him because it was not part of the robbery plan and he never intended to hurt anyone.

At the evidentiary hearing, appellant testified about the incident in greater detail. He said he had his knife out when he initially approached Nguyen at her window, but he had put the knife in his pocket by the time he confronted Bui on the sidewalk and they started fighting. Appellant testified he did not want to hurt Bui, but he did hit him a few times to protect himself. They ended up on the ground, with Bui kicking and squirming and appellant trying to keep him down with his greater body weight. During the struggle, appellant reached into Bui's back pocket for the money, and as he was taking it out, Bui knocked it out of his hand, and it ended up all over the sidewalk.

At that point, appellant gave up the fight, grabbed a few of the bills, and started running. After a few steps, however, he tripped and fell near the curb. When he got up, Bui lunged at him and stabbed him in the shoulder with a knife. Bui then tried to stab him again, but appellant grabbed his knife hand and shoved him back onto the sidewalk.

Appellant ran back toward his car and saw Hamel was in the process of turning it around. After she finished the turn, appellant got in the passenger seat and said, "Let's go." As far as appellant knew, Bui was still back by the sidewalk at that time. He did not notice anyone in the street because he was focusing on his knife wound. But soon after Hamel began driving, he felt and heard a loud crash, after which Hamel asked him, "What the fuck was that?" Appellant testified he did not remember what he said in

10

response to Hamel, but at the time, he thought she had sideswiped Bui's car. He did not know she had run over Bui in the middle of the street.

On cross-examination, the prosecutor asked appellant about that issue and what he said to Hamel in response to her question about what they had crashed into:

"Q. . . . Do you remember telling the police that you told [Hamel], 'You ran him over'?

"A. I did do that six days later because I wasn't very happy with what, what had happened.

"Q. All right. Oh, so you found out later what had happened and, and that's fair enough. I understand what you're saying. Nothing further."

At the evidentiary hearing, the parties also admitted several crime scene photographs into evidence. The photos show Bui's dead body in the middle of the street, as well as the sidewalk where he and appellant fought before he was killed. A wad of twenty dollar bills and a scattering of hundred dollar bills are visible on the sidewalk. A few more bills can also be seen scattered in the street, in the area between the sidewalk and where Bui was killed.

*B. The Trial Court's Ruling*

After hearing arguments from the parties, the trial court issued a 12-page order explaining the basis for its decision. The court stated that, in addition to the testimony and photos admitted at the evidentiary hearing, it had also considered some of the evidence that had been presented at appellant's preliminary hearing. It did not, however, consider the hearsay evidence that was admitted pursuant to Penal Code section 872, or any other evidence that was inadmissible under the Evidence Code.

11

In its ruling, the trial court acknowledged there was no direct evidence how Bui got from the sidewalk, where he initially fought with appellant, to the middle of street, where he was run over and killed. However, based on the totality of the circumstances surrounding the incident, the court made the following findings:

"There is . . . evidence of money strewn on the ground that follows the path from the sidewalk to the point of where Mr. Bui's [body] was found lying.

"Petitioner stated he had no further contact with Mr. Bui [after they fought], that he left Mr. Bui on the sidewalk, got into his car, did not see him in front of his car, and had no knowledge that Mr. Bui was physically in front of his car about to be run over. This statement is available for the Court to assess for credibility and the Court does not find this statement to be possible or true. Clearly the victim, Mr. Bui made his way to the center of the road, approximately 30 feet from the original confrontation on the sidewalk and was directly in front of the car either standing or disabled and on the ground when he was run over. The Petitioner, who was directly interacting with him would be the only person to know this and to know how it had happened.

"Co-defendant Hamel ran over Mr. Bui's head and chest as they escaped. [¶] Petitioner testified that it felt/sounded like they had hit a car as she drove off. [¶] Co-defendant Hamel asked Petitioner 'what was that?', after she hit something. [¶] Petitioner responded 'that was him' (referring to the victim) after the sound of hitting a vehicle was heard. [¶] Petitioner testified he did not see the victim in front of them when they started driving because he began to focus on injuries he had received when he got in the car.

12

"Again, the Court is tasked with evaluating the credibility of [Petitioner's] testimony and it seems clear that when the Petitioner responded at the scene to the Co-defendant's question of 'what was that' with an answer that it was the victim, Mr. Bui, then clearly the Petitioner knew that information or could not have answered the question as he did that 'that was him' referring to Mr. Bui."

Later in its ruling, the trial court reiterated this point by stating, "Petitioner states he didn't ever see Mr. Bui in the middle of the street before he was run over, but he also stated that 'that was him' in response to his co-defendant as soon as she ran him over. Petitioner was aware Mr. Bui was in the middle of the street at the time he was hit or he would not have so commented."

Based on these findings, the trial court found appellant was a major participant in the underlying robbery and acted with reckless indifference to human life, making him liable for murder under the current felony-murder rule. The court therefore denied his petition for resentencing.

## DISCUSSION

Appellant does not challenge the trial court's finding that he was a major participant in Bui's robbery. However, he contends there is insufficient evidence to support the court's finding he acted with reckless indifference to human life. We disagree.

### I.

#### STANDARD OF REVIEW

When the trial court denies a resentencing petition following an evidentiary hearing, we review the court's ruling under the substantial evidence standard. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Njoku* (2023) 95 Cal.App.5th 27, 41–43.) Under that standard, "'we review the

13

evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [court] could reasonably have deduced from the evidence.'" (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

Although the evidence must be "reasonable, credible, and of solid value" (*People v. Jones* (1990) 51 Cal.3d 294, 314), we must remember "'it is the exclusive province of the [trial court] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We do not reweigh the evidence or revisit credibility issues" (*People v. Pham* (2009) 180 Cal.App.4th 919, 924–925), and we "accept all logical inferences that the [court] may have drawn from circumstantial evidence." (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.) "'"If the circumstances reasonably justify the findings made . . . reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."'" (*Ibid.*)

## II.

### THE RECKLESS INDIFFERENCE REQUIREMENT

As the California Supreme Court recently explained in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), the reckless indifference requirement "encompasses both subjective and objective elements. [Citation.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create.'" [Citations.] 'As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her],

14

its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"'" [Citations.]

"'"The degree of risk to human life is crucial to the analysis.' [Citation.] . . . '"Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement.' [Citations.] . . . [P]articipation in a "'garden-variety armed robbery,'" i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel, supra,* 17 Cal.5th at p. 884.)

## III.

### ANALYSIS

In applying these principles to our case, we must first address one of the key disputed facts, which is whether appellant knew Bui was in the middle of the street when he returned to his car after fighting with Bui and instructed Hamel to start driving. Knowing Hamel had turned their car around, appellant obviously knew she was driving in the same general direction as Bui. However, appellant testified he thought Bui was still over by the sidewalk when Hamel started driving. He claimed he did not see anyone in the street at that time.

If the trial court had found that testimony to be credible, it would weigh against a finding appellant acted with reckless indifference to human life. But the court did not believe appellant's testimony on that point. Contrary to what appellant said on the witness stand, the court found as a factual matter that he knew Bui was in the street when Hamel ran him over.

15

Appellant does not dispute the trial court, sitting as the trier of fact, had the right to make credibility determinations in ruling on his petition. But he contends the court's assessment of his credibility rests on an erroneous factual finding—namely, that he answered "that was him" when Hamel asked him what she hit as they were leaving the scene. Indeed, the record shows the court referenced that alleged answer multiple times in finding appellant knew Bui was in the middle of the street when Hamel started driving.

Appellant correctly points out he never testified he told Hamel "that was him" when she asked what she had hit. Rather, he testified he could not remember what he said in response to Hamel's question. In light of that testimony, appellant contends there is insufficient evidence to support the trial court's finding he answered Hamel's question by saying "that was him."

However, shortly after appellant testified that he could not remember what he said to Hamel in that moment, the prosecutor asked him if he remembered *telling the police* that he told Hamel, "'You ran him over.'" Appellant answered, "I did do that six days later because I wasn't very happy with what, what had happened." On its face, that answer indicates that, when appellant was speaking with the police six days after the incident, he did in fact tell them that he told Hamel she had run over Bui when she asked him about that at the scene. From that testimony, the trial court could reasonably infer appellant knew Bui was in the street before appellant instructed Hamel to drive away and Hamel ran Bui over.

In arguing otherwise, appellant relies on how the prosecutor responded to his answer to the question about what he told the police. As set forth above, the prosecutor responded by saying: "All right. Oh, so you found

16

out later what had happened and, and that's fair enough. I understand what you're saying. Nothing further." Appellant interprets that response as proof that his answer meant he did not even know Bui had been killed until six days after the incident, when he spoke with the police. Therefore, he could not possibly have told Hamel "that was him," meaning Bui, when she asked him what she had hit as they were leaving the scene.

We disagree. Quite simply, what the prosecutor said or how he might have construed appellant's answer is not evidence and is not controlling. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11 ["the unsworn statements of counsel are not evidence"]; *People v. Superior Court (Crook)* (1978) 83 Cal.App.3d 335, 341 [same].) The trial court could reasonably interpret appellant's answer (as we do) as conveying three things: (1) *what he told the police in his interview*: when Hamel asked him what she had just hit, he told her it was Bui; (2) *when he made that statement to the police*: six days after the robbery; and (3) *why he made that statement*: he was upset because the robbery had not gone as planned. Together with the physical evidence, that is substantial evidence to support the court's conclusion appellant knew Bui was lying in the street when he instructed Hamel to drive off.

Even if appellant did not tell Hamel at the scene that she had run over Bui, there is still substantial evidence to support the trial court's finding that appellant acted with reckless indifference to human life during his encounter with Bui.

As this court explained in *Carroll*, the reckless indifference requirement has been found lacking in cases where the defendant "plays a minor role in a garden-variety armed robbery, especially if he was not personally armed or physically present at the scene of the killing. [Citations.] [¶] But if the defendant actively participated in the underlying robbery while

17

armed with a deadly weapon and his conduct led to the victim's death, it may be entirely reasonable to infer he acted recklessly indifferent to human life. [Citation.] Indeed, 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' [Citations.] This is true even if the defendant did not actually kill the victim or specifically intend for him to die. [Citations.] Therefore, it is not dispositive that Hamel was the person who killed Bui and that she did so by accident. Instead, we must consider all of the circumstances surrounding the incident in deciding whether substantial evidence supports the trial court's finding appellant acted with reckless indifference to Bui's life." (*Carroll, supra*, G060235.)

With respect to that issue, this court found it significant in *Carroll* that "this was not a garden-variety armed robbery, where the victim was confronted while strolling down the sidewalk or tending to a cash register. Rather, as part of a preconceived plan, appellant used his car to cut off Nguyen and Bui's vehicle while they were driving down the street. This was a dangerous maneuver that immediately brought both vehicles into the mix as potential sources of deadly harm." (*Carroll, supra*, G060235.)

Moreover, "appellant only increased the dangerousness of the situation" when he approached Nguyen's window with a knife and then went after Bui on the sidewalk. (*Carroll, supra*, G060235.) "Even though appellant faced some resistance [from Bui] and ended up getting stabbed himself, he was still able to forcibly extract money from Bui during the course of the violent encounter." (*Ibid.*) And, in doing so, appellant clearly put Bui in a vulnerable situation.

Appellant testified he did not know Bui was in the middle of the street when Hamel started driving in his direction. However, the manner in

18

which Bui's money was scattered at the scene suggests otherwise. Although most of the money was on the sidewalk, where the confrontation between appellant and Bui started, there were also some bills scattered in the street, leading from the sidewalk to where Bui was run over in the street. This "trail of money," as the trial court described it, indicates the confrontation between appellant and Bui was not limited to the sidewalk area, as appellant claimed during his testimony, but likely spilled over into the street before appellant fled.

Other circumstances also support this conclusion. Appellant's version is that the fighting occurred solely on the sidewalk and Bui walked or ran into the street on his own after appellant fled. But, if that were the case, Hamel would have seen Bui when she started driving. She would not have had to ask appellant, "What the fuck was that?" after hitting Bui. Bui's injuries also would have been different if he had been struck while standing in the street. The fact he had tire marks across his body and died from being run over is consistent with the theory that appellant left Bui *lying down in the street* when the fighting ended and he ran back to his car.

This is important because it undermines appellant's testimony that he last saw Bui on the sidewalk and had no reason to believe Bui was in the street when he rejoined Hamel in their car and told her to start driving. Drawing all inferences in favor of the trial court's ruling—as we are required to do—the evidence supports the court's finding that appellant knew Bui was lying in the street and in grave danger when he told Hamel to drive away and, in response to that directive, Hamel hit the gas and drove in Bui's direction. The fact appellant did nothing to minimize or avert that danger speaks volumes about his indifference to human life.

19

These factual circumstances are readily distinguishable from what occurred in *Emanuel, supra.* In that case, the defendant was convicted of felony murder for participating in a robbery during which his cohort, Whitley, fatally shot the victim. However, the robbery was planned to take place during daylight hours in a public park without the use of violence; the defendant did not have a gun or know Whitley was armed; the crime unfolded in less than 10 minutes; the defendant tried to defuse the situation by urging Whitley to leave with him after they were met with unexpected resistance; and the shooting came as a surprise to the defendant after he turned and walked away. (*Emanuel, supra*, 17 Cal.5th at pp. 885–896.) On these facts, the Supreme Court determined there was insufficient evidence "the defendant acted with indifference toward the grave risk that someone could be killed." (*Id.* at p. 895, italics omitted.)

Here, in contrast, appellant planned and carried out the robbery under the cover of darkness while he was personally armed with a deadly weapon. The robbery did take place in public and transpire quickly, but it occurred in the wee hours of the morning, making it improbable witnesses would be present to minimize the potential for violence. Most important, unlike the defendant in *Emanuel*, appellant was the primary participant in the underlying robbery and had good reason to know the victim was in grave danger before he was killed. Despite appellant's claim that he was unaware Bui was in the path of his getaway vehicle, the trial court found otherwise, and, for the reasons explained above, there is substantial evidence to support that finding. Taken together, these factual circumstances are far more egregious than those presented in *Emanuel*.

We conclude as we started, by quoting from our prior opinion in *Carroll*: "All things considered, we are satisfied the trial court's ruling enjoys

20

substantial evidentiary support. Although the evidence that appellant acted with reckless indifference to Bui's life is not overwhelming, it is more than adequate to meet the highly deferential standard applicable to sufficiency-of-the-evidence claims. Therefore, we reject appellant's contention to the contrary." (*Carroll, supra*, G060235.)

## DISPOSITION

The trial court's postjudgment order denying appellant's petition for resentencing is affirmed.

GOODING, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

DELANEY, J.